Jimmy KIRBY, Appellant

v.

LEXINGTON THEOLOGICAL
SEMINARY, Appellee.

No. 2012–SC–000519–DG.

Supreme Court of Kentucky.

April 17, 2014.

Amos N. Jones, The Amos Jones Law Firm, Douglas Clifton Howard, Howard Law Group, PLLC, for Appellant.

Elizabeth S. Muyskens, Richard Garrett Griffith, Stoll, Keenon & Ogden, PLLC, for Appellee.

Erik W. Stanley, Alliance Defending Freedom, Bryan Howard Beauman, Joshua Michael Salsburey, Sturgill, Turner, Barker & Moloney, PLLC, for Amicus Curiae, Alliance Defending Freedom and Association of Christian Schools.

Opinion of the Court by Chief Justice MINTON.

The ministerial exception, rooted in the First Amendment's principles of religious freedom, is a well-settled doctrine applicable to employment disputes between religious institutions and employees serving in a ministerial capacity. Recently, in *Hosanna–Tabor Evangelical Lutheran Church and School v. E.E.O.C.*,[1] the United States Supreme Court added constitutional imprimatur to the ministerial exception but provided little direction for its application. We accepted discretionary review of this employment-dispute case because it presents us with our first opportunity to deal squarely with the ministerial exception's role in the law of Kentucky.

Jimmy Kirby was a tenured professor at Lexington Theological Seminary teaching Christian social ethics for fifteen years before the Seminary terminated his employment. Kirby challenged the validity of his termination by bringing this action against the Seminary for breach of contract, breach of implied covenants of good faith and fair dealing, and race discrimination. The trial court granted summary judgment for the Seminary, ostensibly on First Amendment grounds.

The Court of Appeals affirmed the trial court. Because we disagree with the reasoning employed and result reached by the Court of Appeals, we must now reverse. The analytical approach taken by the Court of Appeals, while adequately grounded in case law, does not provide a workable model for Kentucky courts.

■ Accordingly, today, in this opinion and in *Kant v. Lexington Theological Seminary*,[2] we explicitly adopt the ministerial exception as applicable to employment claims—especially discrimination claims—asserted against a religious institutional employer by an employee who is directly involved in promulgating and espousing the tenets of the employer's faith. In so doing, we align our jurisprudence with the United States Supreme Court, every federal circuit, and the states that have dealt with this issue since the Supreme Court issued its opinion in *Hosanna–Tabor*.

---

1. —— U.S. ——, 132 S.Ct. 694, 181 L.Ed.2d 650 (2012).

2. 2012–SC–000502–DG, 426 S.W.3d 587, 2014 WL 1511387 (Ky. April 17, 2014).

We find Kirby to be a ministerial employee of the Seminary and, as such, subject to the ministerial exception as asserted by the Seminary. Despite this finding, however, we do not hold the ministerial exception to operate as a bar to Kirby's contract claims against the Seminary. The contract claims involve solely the Seminary's willing participation, within a religious context, in a contractual transaction between the two parties. The existence of a contract and its terms remain questions of material fact that are sufficient to defeat summary judgment and warrant further proceedings in the trial court.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

### A. The Seminary.

Founded in 1865, originally as the College of the Bible on the campus of Transylvania University,[3] Lexington Theological Seminary is "an accredited graduate theological institution of the Christian Church (Disciples of Christ)." The stated mission of the Seminary is "to prepare faithful leaders for the church of Jesus Christ and, thus, to strengthen the church's partic-

ipation in God's mission for the world." In executing its mission, the aim of the Seminary is "to prepare women and men of varied backgrounds and traditions for ordained and other forms of ministry." Consistent with this mission and the tenets of the Christian Church (Disciples of Christ), the Seminary is intentionally ecumenical with nearly half of its enrollment coming from other Christian denominations.

Perhaps as a good business practice or perhaps because accreditation standards require it,[4] the Seminary opted to put the policies, procedures, expectations, and other conditions of employment in writing for its faculty, staff, and other employees. Despite the Seminary's argument to the contrary, with regard to faculty, the Faculty Handbook explicitly supersedes the Employee Handbook. The Faculty Handbook stated the fundamental responsibility of faculty [5] "shall be to uphold the purpose of Lexington Theological Seminary to prepare faithful leaders for the Church of Jesus Christ, and, thus to strengthen the Church's participation in God's mission for the world." And although there was no ordination requirement, faculty members were expected "to serve as models for

---

3. Transylvania University, a private liberal arts university, established an affiliation with the Christian Church (Disciples of Christ)—a church movement largely born in Kentucky—in 1865, following the turmoil of the Civil War. The affiliation continues today. Eventually, in 1950, the Seminary relocated away from Transylvania's campus and, in 1965, adopted its current name.

4. The Association of Theological Schools in the United States and Canada, of which the Seminary is an accredited member, lists the following in its *Standards for Accreditation:* "Each school shall articulate and demonstrate that it follows its policies concerning faculty members in such areas as faculty rights and responsibilities; freedom of inquiry; procedures for recruitment, appointment, retention, promotion, and dismissal; criteria

for faculty evaluation; faculty compensation; research leaves; and other conditions of employment. *Policies concerning these matters shall be published in an up-to-date faculty handbook."* Ass'n of Theological Schools in the United States and Canada, *Standards for Accreditation* 5.1.5 Bulletin 50, Part 1 (2012) (emphasis added).

5. The "faculty" of the Seminary was organized in the following hierarchy: Professors, Associate Professors, Assistant Professors, Instructors, and Ministers-in-Residence. Additionally, there were three types of complementary teachers: Adjunct Professors, Visiting Professors, and Lecturers. Professors, Associate Professors, and Assistant Professors were considered positions capable of attaining tenure.

ministry" and, in doing so, "relate to students, staff, and faculty colleagues with integrity and respect." Faculty members were mandated to attend all faculty meetings and participate in formal Seminary events, including orientation. Attendance for informal Seminary events was left to the discretion of the particular faculty member. Finally, faculty members were "expected" but not required to participate in Seminary worship services and convocations.

Of principal importance for this case, the Faculty Handbook also detailed the procedure for termination of tenured faculty. Proceedings to dismiss a tenured professor could only be instituted by the president, the dean, or a member of the faculty. "The only grounds for dismissal of a tenured faculty member are moral delinquency, unambiguous failure to perform the responsibilities outlined in this Handbook, or conduct detrimental to the Seminary." Employed on an annual probationary basis, non-tenured faculty members may only be dismissed for cause, as well.

The Seminary began experiencing severe financial problems in 2009 amidst a nationwide economic downturn. During the period of July 2007 to January 2009, the Seminary saw its endowment shrink from roughly $25 million to $16 million.[6] At that time, the Seminary had ten full-time professors, twenty-one other full-time staff members, and a number of part-time instructors.[7] To survive this "tsunami of economic disasters,"[8] the Seminary decided to abolish a number of faculty and staff positions. The Board of Trustees approved eliminating tenured faculty. And Kirby was among them.

Before terminating Kirby's employment, the Seminary offered him what it called a severance package. This severance package was an additional year's employment with a year's salary, conditioned upon Kirby's release of all potential claims against the Seminary. Kirby declined the offer. Finally, the Seminary restructured its curriculum and mission in an attempt to weather the financial chaos, opting to "emphasize practical training for clergy in areas such as financial management, conflict resolution and the use of technology ... rather than ... theology and biblical studies."[9]

### B. Kirby's Claims Against the Seminary and the Decisions Below.

Following his termination in 2009, Kirby filed this circuit court action against the Seminary. Kirby alleged breach of contract, breach of the implied duty of good faith and fair dealing, and discrimination based on race under Kentucky Revised Statutes (KRS) 344.040. Kirby also sought a declaratory judgment, alleging his termination constituted a breach of contract. The Seminary moved to dismiss the complaint or alternatively to grant summary judgment in its favor. Confronted with arguments to terminate the litigation on First Amendment grounds, the trial court granted the Seminary's motion for summary judgment, apparently accepting the argument that the relationship between Kirby and the Seminary was an ecclesiastical matter beyond the reach of the courts.

On appeal, the Court of Appeals found that resolving Kirby's claims would constitute a breach of the ecclesiastical absten-

---

6. Peter Smith, *Lexington seminary faces fiscal crisis*, LOUISVILLE COURIER-JOURNAL, January 14, 2009, *available at* http://www.lextheo.edu/wpcontent/uploads/2009/01/ltsfacescrisis.pdf.

7. *Id.*

8. *Id.*

9. *Id.*

tion doctrine and drag the court into a religious dispute. Leaning heavily on the *Hosanna–Tabor* decision, the Court of Appeals also found Kirby to be a ministerial employee and, as such, affirmed the trial court's summary judgment under the ministerial exception.

## II. ANALYSIS.

Kirby argues the lower courts improperly and prematurely halted his action against the Seminary by simply creating a per se rule that all seminary professors are ministers. In doing so, the lower courts viewed the ministerial exception as a jurisdictional bar—a posture Kirby finds untenable. The ministerial exception, according to Kirby, does not bar the instant claims either because Kirby is frankly not a minister under the law or, even if Kirby is a minister under the law, a claim for breach of contract is not barred. For the reasons stated below, we agree with Kirby.

 Because this case is before us on a grant of summary judgment, we are mindful of our standard of review when resolving such matters. Summary judgment is only to be granted "to terminate litigation when, as a matter of law, it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor and against the movant."[10] Summary judgment is not intended as a substitute for trial and should be cautiously applied.[11]

Instead of deciding an issue of fact, the trial court *reviews* the evidence to determine whether a real issue of fact exists.[12] And in performing this review, the trial court must view the evidence through a lens colored in favor of the party opposing summary judgment. So the facts in this case must be viewed in a light most favorable to Kirby.

 Appellate review of a summary judgment involves only legal questions and a determination of whether a disputed material issue of fact exists.[13] Consequently, we need not defer to determinations by the lower courts and we are free to operate under a de novo standard of review. With little exception, the facts of this case are undisputed. Of course, the application or effect of the facts is strongly contested.

### A. We Adopt the Ministerial Exception in Kentucky.

The ministerial exception is best understood as a narrow, more focused subsidiary of the ecclesiastical abstention doctrine, which we will discuss later in this opinion. To this point in our jurisprudence, we have not explicitly adopted the exception in Kentucky or provided guidance as to how courts should determine whether an employee of a church or religious institution is a ministerial employee.[14] Kentucky's courts have, instead, been burdened with the application of the ecclesiastical abstention doctrine in situations where the minis-

---

10. *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.,* 807 S.W.2d 476, 483 (Ky.1991) (quotation marks and citation omitted). Of course, "impossible" is applied in "a practical sense, not in an absolute sense." *Perkins v. Hausladen,* 828 S.W.2d 652, 654 (Ky.1992).

11. *Id.*

12. *Id.* at 480.

13. *Shelton v. Kentucky Easter Seals Soc., Inc.,* 413 S.W.3d 901, 905 (Ky.2013).

14. *Music v. United Methodist Church,* 864 S.W.2d 286 (Ky.1993), has been cited at times as the case in which the ministerial exception was adopted into Kentucky jurisprudence. *See* Douglas Laycock, *Hosanna–Tabor and the Ministerial Exception,* 35 HARV. J.L. & PUB. POL'Y 839, 846 n. 43 (2012) (compiling cases). We understand that *Music* dealt with a minister and virtually the ministerial exception, but we endeavor explicitly to adopt the ministerial exception today and outline the proper method for its application.

terial exception might have proved more useful.

■■■■ Simply stated, the ministerial [15] exception is a judicially created "principle whereby the secular courts have no competence to review the employment-related claims of ministers against their employing faith communities[.]" [16] Barring a Salvation Army employee's Title VII claim, the Fifth Circuit, in creating the ministerial exception over forty years ago, relied heavily on preserving church autonomy and not even peeking over the "wall of separation" between church and state. [17] According to the court in *McClure v. Salvation Army*, the "relationship between an organized church and its' ministers is its lifeblood" because the minister "is the chief instrument by which the church seeks to fulfill its purpose." [18] And "law should not be construed to govern the relationship of a church and its ministers." [19] This proposition, ubiquitous in the case law, is the backbone of the ministerial exception.

Although *ministerial* it is in name, the exception, as *McClure* illustrates, has been applied to lay employees, seminary professors,[20] hospital workers,[21] press secretaries,[22] musicians,[23] and many others. Generally speaking, while the group of plaintiffs has expanded under the development of case law in this area, the type of claim involved in the application of the exception has remained relatively the same. Discrimination claims, typically under federal civil rights or their state analogs, have dominated the ministerial exception landscape.[24] *Hosanna–Tabor* was no different.

---

15. It is worthwhile to note, as Justice Alito highlighted in his *Hosanna–Tabor* concurring opinion, that the "ministerial" exception is not, nor should it be, limited to religions that use the term "minister." We provide Justice Alito's remarks here as a reminder to courts that the shorthand name for this constitutionally-based exception does not limit its scope:

> The term 'minister' is commonly used by many Protestant denominations to refer to members of their clergy, but the term is rarely if ever used in this way by Catholics, Jews, Muslims, Hindus, or Buddhists. In addition, the concept of ordination as understood by most Christian churches and by Judaism has no clear counterpart in some Christian denominations and some other religions. Because virtually every religion in the world is represented in the population of the United States, it would be a mistake if the term 'minister' or the concept of ordination were viewed as central to the important issue of religious autonomy that is presented in cases like this one. *Hosanna–Tabor*, 132 S.Ct. at 711 (Alito, J., concurring).

16. Mark E. Chopko & Marissa Parker, *Still a Threshold Question: Refining the Ministerial Exception Post–*Hosanna–Tabor, 10 First Amend. L.Rev. 233, 234 (Winter 2012) (internal citations omitted).

17. *McClure v. Salvation Army*, 460 F.2d 553 (5th Cir.1972). "Title VII claim" refers to Title VII of the Civil Rights Act of 1964, dealing with employment discrimination.

18. *Id.* at 558–59.

19. *Hope Intern. Univ. v. Superior Court*, 119 Cal.App.4th 719, 14 Cal.Rptr.3d 643, 645 (2004).

20. See *Klouda v. Sw. Baptist Theological Seminary*, 543 F.Supp.2d 594 (5th Cir.2008).

21. See *Hollins v. Methodist Healthcare, Inc.*, 474 F.3d 223 (6th Cir.2007).

22. See *Alicea–Hernandez v. Catholic Bishop of Chi.*, 320 F.3d 698 (7th Cir.2003).

23. See *E.E.O.C v. Roman Catholic Diocese of Raleigh N.C.*, 213 F.3d 795 (4th Cir.2000) (finding director of music ministry at local cathedral elementary school a minister); *Starkman v. Evans*, 198 F.3d 173 (5th Cir. 1999) (finding choir director to be ministerial employee).

24. "Notably, the ministerial exception has not been automatically extended to contexts beyond employment discrimination laws."

After letting the ministerial exception percolate throughout the federal circuits, the Supreme Court was finally faced with, within the context of a Title VII claim, the ministerial exception's constitutional viability. *Hosanna–Tabor* centered on Cheryl Perich's disability claim against her employer, a small school operated by Hosanna–Tabor Evangelical Lutheran Church and School. Hosanna–Tabor was a member congregation of the Lutheran Church–Missouri Synod. Perich was a "called" teacher of math, language arts, social studies, science, gym, art, and music. Additionally, Perich "taught a religion class four days a week, led the students in prayer and devotional exercises each day, and attended a weekly school-wide chapel service." [25] And "Perich led the chapel service herself about twice a year." [26]

The Court "agree[d] that there is such a ministerial exception[,]" [27] finding it deeply rooted in both the Free Exercise and Establishment Clauses of the First Amendment. Noting the two clauses "often exert conflicting pressures," the Court explained that was not the case with the ministerial exception because "[b]oth Religion Clauses bar the government from interfering with the decision of a religious group to fire one of its ministers." [28] The Court approved the application of the ministerial exception to individuals outside simply the "head of a religious congregation." [29] Additionally, the Court emphasized the reasoning behind the church's decision is essentially irrelevant under the ministerial exception. The existence of the ministerial exception is not purposed on the protection of a "church's decision to fire a minister only when it is made for a religious reason" but, instead, to "ensure[ ] that the authority to select and control who will minister to the faithful . . . is the church's alone." [30]

The Court, however, declined "to adopt a rigid formula for deciding when an employee qualifies as a minister." [31] To be sure, the Court did not constitutionalize any litmus test for a ministerial employee; but the Court did seem to cast considerable doubt on the "primary duties" test as used by the Sixth Circuit below. Importantly, the "primary duties" test has been prominent throughout the federal circuits with a few circuits now shifting away.[32] We are left with, instead, no more than the Court's treatment of Perich as a guide to how the ministerial exception should be applied.

Broadly speaking, the Court appeared to take an approach akin to a review of the totality of the circumstances. Important to the Court's conclusion were various facts, including: Hosanna–Tabor held Perich out as a minister, with a role distinct from that of most of its members; the church issued Perich a "diploma of vocation" per her title, "Minister of Religion, Commissioned"; Perich's "skills of ministry" and "ministerial responsibilities" were periodically reviewed by the congregation; Perich held herself out as a minister,

---

Note, *The Ministerial Exception to Title VII: The Case for a Deferential Primary Duties Test*, 121 Harv. L.Rev. 1776, 1778 (2008).

25. *Hosanna–Tabor*, 132 S.Ct. at 700.

26. *Id.*

27. *Id.* at 706.

28. *Id.* at 702 (internal citations omitted).

29. *Id.* at 707.

30. *Id.* at 709 (internal citations omitted).

31. *Id.* at 707.

32. Summer E. Allen, *Defining the Lifeblood: The Search for a Sensible Ministerial Exception Test*, Note & Comment, 40 Pepp. L.Rev. 645, 670–81 (2013) (compiling cases and detailing circuit transitions for various circuits).

claiming a special housing allowance on her taxes available only to those earning income "in the exercise of ministry"; Perich was required to complete a significant amount of religious training followed by a formal process of commissioning; and Hosanna–Tabor explicitly cloaked Perich with the responsibility of "leading others toward Christian maturity" and "teaching faithfully the Word of God, the Sacred Scriptures, in its truth and purity and as set forth in all the symbolical books of the Evangelical Lutheran Church."[33] In sum, perhaps as close to a test as we now have, the Court found Perich was a minister under the ministerial exception in light of "the formal title given Perich by the Church, the substance reflected in that title, her own use of that title, and the important religious functions she performed for the Church."[34]

Regarding the ministerial exception's solid reasoning or applicability, we find the unanimity displayed by the Supreme Court and the federal circuit courts overwhelmingly persuasive. The Constitution demands recognition of the ministerial exception, so we now incorporate the ministerial exception into our jurisprudence. In the interest of clarity, we attempt to expand on the nebulous method of application employed by the Supreme Court and federal circuits.

### 1. The Ministerial Exception is an Affirmative Defense that Must be Pleaded and Proved.

Initially, we must determine exactly what the ministerial exception *is*. The question remains whether the ministerial exception operates as an affirmative defense to the merits or a jurisdictional bar to the action. The Supreme Court, in a *Hosanna–Tabor* footnote, was rather clear in its estimation that the exception is an affirmative defense. After noting a circuit split on the issue,[35] the Court stated, "We conclude that the exception operates as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar. That is because the issue presented by the exception is 'whether the allegations the plaintiff makes entitle him to relief,' not whether the court has power to hear [the] case."[36] While entirely accurate and persuasive, this footnote provides little guid-

---

**33.** *Hosanna–Tabor,* 132 S.Ct. at 708.

**34.** *Id.* Justice Alito, in concurrence, arguably offered a broader view of the ministerial exception's application. By his estimation, the ministerial exception should be focused "on the function performed by persons who work for religious bodies" and apply to "any employee who leads a religious organization, conducts worship services or important religious ceremonies or rituals, or serves as a messenger or teacher of its faith." *Id.* at 711–12 (Alito, J., concurring) (internal quotation marks omitted). Accordingly, Justice Alito agreed Perich was a minister because she "played a substantial role in conveying the Church's message carrying out its mission" and was "an instrument of her church's religious message and [ ] a leader of its worship activities." *Id.* at 714–15 (Alito, J., concurring) (internal quotation marks omitted). Of

course, Justice Thomas promoted a fully deferential approach based primarily, if not solely, on the church's sincere belief of Perich's status as a minister. *See id.* at 710–11 (Thomas, J., concurring).

**35.** *Compare Petruska v. Gannon Univ.,* 462 F.3d 294, 302 (3d Cir.2006) (applying as affirmative defense); *Bryce v. Episcopal Church in the Diocese of Colo.,* 289 F.3d 648, 654 (10th Cir.2002) (same); *Bollard v. Cal. Province of the Soc'y of Jesus,* 196 F.3d 940, 951 (9th Cir.1999) (same); *Natal v. Christian & Missionary Alliance,* 878 F.2d 1575, 1578 (1st Cir.1989) (same), *with Hollins,* 474 F.3d at 225 (6th Cir.2007) (applying as jurisdictional bar); *Tomic v. Catholic Diocese of Peoria,* 442 F.3d 1036, 1038 (7th Cir.2006) (same).

**36.** *Id.* at 709 n. 4 (internal quotation marks omitted).

ance, however, in how the ministerial exception should actually operate in practice.

■■■ From a broad perspective, the ministerial exception does not strip a court of its jurisdiction but, instead, simply disallows the forward progress of the particular suit. The ministerial exception's very name inherently suggests it does not operate as a jurisdictional bar. It is an exception, not an exemption.[37] Most likely, a great deal of the current disagreement over the ministerial exception's proper operation stems from the conflation of the ministerial exception with the broader principle of ecclesiastical abstention. Secular courts do not have jurisdiction to hear disputes over church doctrine.[38] But courts do have jurisdiction to hear and resolve employment disputes, contract claims, tort claims, or similar. And that authority is not lost as a result of the ministerial exception.[39]

■■■ "If the church autonomy doctrine applies to the statements and materials on which plaintiffs have based their claims, then the plaintiffs have no claim for which relief may be granted."[40] That is,

"[t]he exception may serve as a barrier to the success of a plaintiff's claims, but it does not affect the court's authority to consider them."[41] Viewing the ministerial exception this way, it becomes apparent that procedurally speaking, in Kentucky jurisprudence, a government official's defense of qualified immunity is analogous. And qualified immunity, as a type of pleading dealing in confession and avoidance, *i.e.*, pleading "more or less to admit the general complaint and yet to suggest some other reason why there was no right,"[42] must be specifically pleaded in the answer.[43] We see no reason why the ministerial exception would operate different procedurally. The Seminary admits it terminated Kirby's tenure but simply argues it had the right to do so under the ministerial exception.

■■■ Our case law has long held that "whether a particular defendant is protected by official immunity is a question of law[.]"[44] Accordingly, we hold the determination of whether an employee of a religious institution is a ministerial employee is a question of law for the trial

---

37. *See* Marsha B. Freeman, *What's Religion Got to do With it? Virtually Nothing:* Hosanna–Tabor *and the Unbridled Power of the Ministerial Exemption,* 16 U. Pa. J.L. & Soc. Change 133, 145 (2013) ("An exception is adverse to the general rule, but not necessarily an absolute; it must be shown to apply. An exemption, on the other hand, is an unconditional immunity from action.").

38. While courts in increasing number are invalidating constitutional amendments and statutes prohibiting same-sex marriage, no one would argue courts have the authority to settle disputes among congregations over whether a particular church should accept same-sex marriage.

39. *See Petruska,* 462 F.3d at 302 ("[T]he question does not concern the court's power to hear the case—it is beyond cavil that a federal district court has the authority to review claims arising under federal law—but rather

whether the First Amendment bars Petruska's claims.").

40. *Bryce,* 289 F.3d at 654.

41. *Petruska,* 462 F.3d at 303.

42. *Gomez v. Toledo,* 446 U.S. 635, 641 n. 8, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980).

43. *See* Kentucky Rules of Civil Procedure (CR) 8.03.

44. *Rowan Co. v. Sloas,* 201 S.W.3d 469, 475 (Ky.2006); *see also Jarvis v. Wellman,* 52 F.3d 125, 126 (6th Cir.1995) ("The applicability of the doctrine of qualified immunity involves a question of law, and we therefore review de novo the district court's decision.") (applying Kentucky law); *Megenity v. Stenger,* 27 F.3d 1120, 1123–24 (6th Cir.1994) (applying Kentucky law).

court, to be handled as a threshold matter.[45] Certainly, it is important "that these questions be framed as legal questions and resolved expeditiously at the beginning of litigation to minimize the possibility of constitutional injury" and provide the litigants with a clear understanding of the litigation's track.[46] The religious institution asserting the ministerial exception must bear the burden of proof to show the employee was, indeed, a minister.

### 2. What Constitutes a Ministerial Employee? And was Kirby a Ministerial Employee?

The application of the ministerial exception requires two main inquiries:

1) is the employer a religious institution, and

2) is the employee a minister.[47]

### a. The Seminary is a religious institution.

 Importantly, the scope of "religious institution" is not so narrow that only traditional faith communities qualify.[48] Across the federal circuits, the ministerial exception has been applied to religiously affiliated hospitals, schools, and corporations because they were sufficiently within the understanding of "religious institution."[49] An entity, allegedly religiously affiliated, will be considered a "religious institution" for purposes of the ministerial exception "whenever that entity's mission is marked by clear or obvious religious characteristics."[50] For the following reasons, it is beyond question that the Seminary exists as a religious institution under the ministerial exception.

The Seminary receives its principal funding from the Disciples Mission Fund of the Christian Church (Disciples of Christ). Individual Christian Church (Disciples of Christ) congregations donate to the Disciples Mission Fund, which is then responsible for distributing the funds to entities or organizations acting in furtherance of the church's mission. As a condition to the receipt of this funding, the Seminary is required to exist in a covenant relationship with the Christian Church (Disciples of Christ). In turn, the Seminary is required to, among other things, "work in partnership to support the total mission of the Christian Church (Disciples of Christ)" and "educate and train staff and volunteers in order that they might effectively interpret and promote the church's wider mission." And, in order to continue receiving funding from the Disciples Mission Fund, the Seminary must provide an accounting to the Christian Church (Disciples of Christ) for its consid-

**45.** The denial of qualified immunity under our case law is "subject to prompt appellate review." *Breathitt Cnty. Bd. of Educ. v. Prater*, 292 S.W.3d 883, 886 (Ky.2009). Interlocutory appellate review is available—even in the absence of a final judgment—because the denial of immunity is a "substantial claim[ ] of right which would be rendered moot by litigation and thus [is] not subject to meaningful review in the ordinary course following a final judgment." *Id.* Likewise, the denial of a religious institution's assertion of the ministerial exception, *i.e.*, trial court finding the employee not to be a ministerial employee, is appropriate for interlocutory appeal.

**46.** Chopko & Parker, *supra* note 16, at 292–93.

**47.** *Hollins*, 474 F.3d at 225.

**48.** *Id.* ("[T]o invoke the exception, an employer need not be a traditional religious organization such as a church, diocese, or synagogue, or an entity operated by a traditional religious organization.").

**49.** *Id.* (citing *Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F.3d 299, 309–10 (4th Cir.2004) (compiling cases)).

**50.** *Id.* at 226.

eration on an annual basis. It is uncontroverted that the Seminary has operated within this covenant relationship during all periods relevant to this case.

Of course, the Seminary receives additional funding from sources outside the Disciples Mission Fund. Donations are directly received from Christian Church (Disciples of Christ) congregations, their members, and Seminary alumni. According to James P. Johnson, former president of the Seminary, the "overwhelming majority of individuals and alumni financially supporting the Seminary are affiliated with the Christian Church (Disciples of Christ)." In addition, the Seminary receives income from various endowments, nearly ninety percent of which "are from the Christian Church (Disciples of Christ) or members of the Christian Church (Disciples of Christ)." The pervasiveness of the relationship between the Christian Church (Disciples of Christ) and the Seminary is undeniable.

The bylaws and governing structure of the Seminary further indicate the existence of a "special relationship with and responsibility to" the Christian Church (Disciples of Christ). At least sixty percent of the Seminary's Board of Trustees must be members in good standing of the Christian Church (Disciples of Christ). The General Minister of the Christian Church (Disciples of Christ) must be included as an ex officio member, with a vote. The Seminary's president, as well as a majority of the faculty, must be members of the Christian Church (Disciples of Christ) in good standing. As mentioned previously, the Christian Church (Disciples of Christ) is an ecumenical faith, accordingly emphasizing interdenominational unity. In turn, the Seminary takes affirmative action to be ecumenical, as well.[51] In doing so, the Seminary sometimes hires members of other denominations to serve in the professorial role. Kirby is a member of the Christian Methodist Episcopal Church (CME), having never been a member of the Christian Church (Disciples of Christ).[52] And, of course, in *Kant*, our companion case, Kant was Jewish.

Consistent with the overarching ecumenical view, the Seminary awards various degrees. At the time relevant to this litigation, the Seminary was accredited to award four degrees,[53] all with different goals, but all requiring religious and theological study.[54] The Master of Divinity was "a professional degree designed to help men and women preparing for the

---

**51.** In point of fact, the Seminary "thankfully embraces in its students, faculty, staff, and trustees a wide variety of denominations and theological perspectives."

**52.** The Christian Church (Disciples of Christ) has an official ecumenical relationship with CME through their mutual membership in Churches Uniting in Christ (CUIC), a covenant relationship among eleven Christian communities.

**53.** For the sake of accuracy, we note the Seminary also provided various cooperative education programs, including but not limited to: advanced work in clinical pastoral education at the University of Kentucky's Chandler Medical Center; a double-competence program in ministry and social work allowing seminarians to earn a degree from the Seminary, as well as a Master of Social Work from UK; a certificate in gerontology from UK; a "strong working relationship with the Committee on Preparation for Ministry of the Transylvania Presbytery[,]" including various courses on Presbyterian theology; and the Cooperative Baptist Fellowship, offering courses in Baptist history and polity covering a broad range of traditions.

**54.** The Seminary has since altered its degree offerings to include: Master of Divinity, Master of Theological Studies, Master in Pastoral Studies, and Doctor of Ministry. *See* http://www.lextheo.edu/degree-programs/ (last accessed March 25, 2014, 12:18pm).

Christian ministry" and is "required for ordination by many denominations." Master of Arts was "a program designed to prepare women and men for a wide variety of ministries including advanced graduate study in one of the theological disciplines." For those students "who desire[d] to improve and integrate their theological understanding and pastoral skills[,]" the Seminary offered a Doctor of Ministry. And for Roman Catholic students who were "preparing for lay ministries in the parish[,]" the Seminary offered a Master of Arts. Through these degree offerings, the Seminary displayed its "primary focus [ ] on preparation for pastoral ministry in the congregation." The Seminary, secondarily, emphasized the "programs of study may also prepare persons for such specialized ministries as Christian education, youth ministry, institutional chaplaincy, and campus ministry."

### b. Kirby is a ministerial employee.

█ The determination of whether Kirby is a ministerial employee is much more complicated than the determination of the Seminary's religious-institution status. Courts have unanimously adopted the ministerial exception but have varied somewhat in determining what constitutes a minister for ministerial exception purposes. Some courts, out of excessive-entanglement concerns, have refused even to engage in review of whether an employee is ministerial.

We are loath to adopt a categorical rule regarding Seminary professors or any other class of individuals who may be considered ministers under the ministerial exception.[55] And, like the United States Supreme Court, we do not adopt a "rigid formula" for deciding if an employee is a minister. "It is enough for us to conclude, in this our first case involving the ministerial exception, that the exception covers [Kirby], given all the circumstances of [his] employment."[56] Here, Kirby is not ordained, of course, but that is not dispositive. Given Kirby's extensive involvement in the Seminary's mission, religious ceremonies, and the subject matter of Kirby's teaching, it is clear that Kirby is a ministerial employee.

In 1994, the Seminary, in a letter addressed to Kirby, "issued a call to carry out [his] ministry by serving as Instructor of Church and Society." As a member of the faculty, Kirby was tasked with carrying out the mission of the Seminary to prepare students for the ministry of Jesus Christ. Primarily, Kirby's teaching focused on "helping students understand what the basic socio-ethical issues are and the nature of the Christian (or Christ-like) response." Kirby also found "helping students to understand why ethics is important in all that they will ever do in ministry" and emphasizing "Christian methods of moral judgment" important aspects of his professorial role.[57] In addition, Kirby

---

**55.** The ministerial exception has been applied categorically to professors, whether ordained or not, at religiously affiliated schools that teach the institution's own religion, as well as to professors at theological seminaries. *See, e.g., E.E.O.C. v. Catholic Univ. of Am.*, 83 F.3d 455 (D.C.Cir.1996); *E.E.O.C. v. Sw. Baptist Theological Seminary*, 651 F.2d 277 (5th Cir. 1981). We acknowledge this line of cases but decline to follow their rule, instead opting for a case-by-case review.

**56.** *Hosanna–Tabor*, 132 S.Ct at 707.

**57.** Some of the courses Kirby taught include: Introduction to Christian Social Ethics, The Church and the Urban Poor, The Cultural Context of Ministry, and The Black Religious Experience in America. Christian social ethics, according to Kirby, is an "interdisciplinary field" seeking "emergent coherence." Principally, Christian social ethics "implies that ethics is concentrated predominantly upon the behavior of human groups and is done from a deliberately Christian perspective."

began each class with a voluntary partici-patory prayer regarding the social issues and injustices he taught about.

During his employment at the Seminary, Kirby participated in chapel services, con-vocations, faculty retreats, and other reli-gious events. And Kirby preached on nu-merous occasions at both his own CME congregation and various Christian Church (Disciples of Christ) congregations. Spe-cifically,

- Kirby read scripture and served at the communion table during the Semi-nary's 1996 Thanksgiving service.

- As a worship leader in 1998, Kirby presided over a Monday worship ser-vice, the service for entering students, and the faculty retreat. The Monday service and the service for entering students were held in the Seminary chapel.

- In 2004, Kirby represented the Semi-nary as a Delegate at the Inauguration Ceremony for Dr. Michael A. Battle, the 7th President of the Interdenomi-national Theological Center; served as a representative of the Seminary at the dedication of the new Seigakuin University Chapel in Tokyo; and de-livered the call to worship and opening prayer at an ordination service; and read scripture at the communion ser-vice honoring the Seminary graduates.

- In 2005, Kirby gave the invocation at the ordination service for Christine

Reisman and served as the representa-tive of the Seminary at the inaugu-ration of Dr. Mary Evans Sias as President of Kentucky State Universi-ty; performed a reading and served communion during multiple chapel ser-vices; gave the pastoral prayer for multiple chapel services; served com-munion for the Seminary's service for its graduates; provided the morning prayer at the faculty retreat; and of-fered the prayer for the ministerial candidate, Susan Gabbard, at her ordi-nation service.

- Kirby's active participation in Semi-nary events continued into 2006 when he delivered the prayer at the installa-tion service for Seminary Dean Daisy L. Machado; played Eli (the biblical character) for a student class presen-tation; participated in several ordina-tion services by giving the prayer and reading scripture; and offered a pray-er for the graduates at the graduation communion service.

In sum, we conclude that Kirby is close-ly connected to the tenets of the faith espoused by the Seminary [58] and actively involved in the promotion of the Semi-nary's mission. As a professor at an ecu-menical Seminary, instructing on Christian principles, Kirby serves as a representa-tive of the Seminary's message.[59] Kirby has, on multiple occasions, served as the

---

**58.** At oral argument, the Seminary attempted to separate from the Christian Church (Disci-ples of Christ) for the purposes of the tenets the Seminary purports to represent. As the recitation of facts above indicates, the Semi-nary is closely affiliated with the Christian Church (Disciples of Christ) and, presumably, would espouse those tenets. We do not make that determination today and take no position on the appropriateness of making that decision because regardless of whether the Seminary's tenets for purposes of the

ministerial exception are simply those shared by Christian faith communities generally or mirror doctrines that might be unique to the Christian Church (Disciples of Christ) de-nomination, Kirby is a ministerial employee. Furthermore, it is of no import that the Sem-inary's tenets are of a broad, ecumenical na-ture. The First Amendment protection af-forded remains the same.

**59.** *See Patruska,* 462 F.3d at 306.

Seminary's official representative, ambassador, and voice to the faithful.[60]

We reach this conclusion primarily through consideration of all the circumstances of Kirby's employment and participation during his employment with the Seminary. In *Hosanna–Tabor*, most likely to avoid unnecessarily delving into church matters to determine Perich's ministerial status—which was clear—the Supreme Court offered four generic factors to consider when determining a ministerial employee: (1) the formal title given by the religious institution, (2) the substance reflected in that title, (3) her own use of the title, and (4) the important religious functions performed for the religious institution. These considerations are a suitable foundation, but we seek to expand on them today. Three of the four factors take into account the title given to the employee. We find the title important because it indicates not only how the religious institution views the employee but also how the members of the faith community or recipients of the employee's services view the employee. It is our belief more discussion of the actual acts or functions conducted by the employee would be prudent.[61]

As a result, we attempt to add substance to the four factors, hopefully providing guidance to trial courts.[62] We are aware, as the Court touched on in *Hosanna–Ta-bor*, that employees of religious institutions rarely, if ever, perform exclusively religious tasks. In reality, employees perform an amalgam of secular and religious duties, in turn necessitating a highly malleable method of determining whether an employee is a minister. The formula we detail here—while more involved than that expressed in *Hosanna–Tabor*—is, in our opinion, equally flexible and allows the court to address adequately the wide range of circumstances possibly presented in religious employment disputes.

 When considering "the formal title given," a trial court should weigh whether the title is inherently, exclusively, or primarily religious. The consideration of the "substance reflected in the title" should include the duties and responsibilities associated with the title. The trial court, in looking to the associated duties and responsibilities, may look at whether they carried substantial religious significance, involved supervision or participation in religious ritual and worship, or spread the tenets or doctrine of the faith.[63] "[The employee's] own use of the title" should include consideration of whether the position involved, expected, or required proselytizing on behalf of the religious institution. Or did the employee use the title in a manner that would indicate to the mem-

---

60. *Id.*

61. As detailed previously, Justice Alito's concurring opinion shares our concern about the potential danger of hyper-focusing on the title given to an employee to the detriment of religions who "do not employ the term minister[,]" "eschew the concept of formal ordination[,]" or "consider the ministry to consist of all or a very large percentage of their members." *Hosanna–Tabor*, 132 S.Ct. at 713–14 (Alito, J., concurring) (internal quotation marks omitted).

62. In doing so, we incorporate various factors outlined in *Weishuhn v. Catholic Diocese of Lansing*, 279 Mich.App. 150, 756 N.W.2d 483 (2008).

63. We pause to emphasize the link between the employee's title or conduct and the actual tenets or doctrine of the religious institution. It is important that as a ministerial employee, the employee be involved with the tenets of the faith. As detailed in *Kant*, an employee simply engaging in religious discourse cannot serve as a minister of the religious institution without involving himself in the doctrine or tenets of the faith. Simply promoting the mission of the religious institution alone is not sufficient.

bers of the particular faith community or to the public that he was a representative of the religious institution authorized to speak on church doctrine? Finally, consideration of "the important functions performed for the religious institution" should involve a review of whether those functions were essentially liturgical, closely related to the doctrine of the religious institution, resulted in a personification of the religious institution's beliefs, or were performed in the presence of the faith community.

If, after the consideration of these factors, in light of the totality of the circumstances, the trial court finds an employee is a minister under the law, the religious institution is entitled to the benefit of the ministerial exception. Kirby satisfies most of the factors listed above. He gave sermons on multiple occasions, served communion, taught classes on Christian doctrine, opened class with prayer each day, affirmatively promoted students' development in the ministry, and served as a representative—a literal embodiment—of the Seminary at events on multiple occasions. The record is clear that Kirby conducted worship services, important religious ceremonies and rituals, and acted as a messenger of the Seminary's faith. He is most certainly a ministerial employee of the Seminary.

### B. The Ministerial Exception's Effect on Kirby's Claims.

Finally, we must determine what impact, if any, finding an employee to be a minister has on an employee's action against his former religious institutional employer. Do any of Kirby's claims survive summary judgment even though he qualifies as a

ministerial employee under the ministerial exception? Important in this analysis is the role played by the ecclesiastical abstention doctrine.

### 1. Kirby's Claim Under KRS 344.040 may not Proceed.

From the outset, we can dispense with Kirby's racial discrimination claim. In *Hosanna–Tabor*, the Supreme Court made clear that the ministerial exception bars employment discrimination suits. And, in addition, the pre-*Hosanna-Tabor* case law regarding the interplay between anti-discrimination statutes and the ministerial exception is clear: these claims are barred. As a result, Kirby's claim under KRS 344.040, the Kentucky Civil Rights Act, simply ends with the determination that Kirby is a ministerial employee. Of course, *Hosanna–Tabor* involved federal legislation rather than KRS 344.040 or any other state parallel. But KRS 344.040 has been interpreted as consistent with the federal Civil Rights Act.[64] We see no reason why the reasoning of *Hosanna–Tabor* should not apply equally to Kentucky employment discrimination legislation.

Employment discrimination laws require employers to meet certain fairness standards in hiring and firing employees. Enforcing these laws on religious institutions, possibly against the religious institution's sincerely held beliefs, goes to the core of the purpose behind the ministerial exception because the government would "depriv[e] the church of control over the selection of those who will personify its beliefs." [65] A religious institution may hold beliefs that are discriminatory under a particular anti-discrimination statute and the ministerial exception acts to protect the religious freedom of those institutions

---

**64.** *See, e.g., Stewart v. Univ. of Louisville,* 65 S.W.3d 536 (Ky.App.2001); *Sharp v. Aker Plant Serv. Grp., Inc.,* 726 F.3d 789 (6th Cir. 2013) (applying Kentucky law); *Clark v. Unit-*

*ed Parcel Serv., Inc.,* 400 F.3d 341 (6th Cir. 2005) (applying Kentucky law).

**65.** *Hosanna–Tabor,* 132 S.Ct. at 706.

no matter how distasteful society may find it or how strong the societal interest may be.[66]

## 2. *Kirby's Contract Claims may Proceed.*

Kirby's claims based in contract, however, can survive despite our determination that Kirby is a ministerial employee for purposes of the ministerial exception. Our reasoning is two-fold: (1) the enforcement of the contractual arrangement between the Seminary and Kirby does not arouse concerns of government interference in the selection of ministers, and (2) the contract does not involve any matters of ecclesiastical concern that would otherwise bar the suit under the ecclesiastical abstention doctrine. We will address each in turn, as well as the interplay between the two.

### a. *By allowing Kirby's breach of contract claim to proceed, the government is not interfering in the Seminary's selection of its ministers.*

■■■ When deciding whether a claim is barred by the ministerial exception, it is important to remain mindful of the ministerial exception's underlying purpose: to allow religious institutions, free from government interference, to exercise freely their right to select who will present their faith tenets. Although state contract law does involve the governmental enforcement of restrictions on a religious institution's right or ability to select its ministers, those restrictions are not *governmental* restrictions. Simply put, the restrictions do not arise out of government involvement but, rather, from the parties to the contract, namely, the religious institution and its employee.

■■■ Contractual transactions, and the resulting obligations, are assumed voluntarily. Underneath everything, churches are organizations.[67] And, like any other organization, a "church is always free to burden its activities voluntarily through contracts, and such contracts are fully enforceable in civil court."[68] Surely, a "church can contract with its own pas-

---

66. Additionally, civil rights legislation, both Kentucky's and its federal counterpart, allows for reinstatement, backpay, frontpay, attorney's fees, and punitive damages. We will discuss compensatory damages further below, but reinstatement cannot be an option because that would involve a court placing a minister in a church against the church's wishes.

67. Churches are associations of like-minded individuals banding together to voice their beliefs. "The right to freedom of association is a right enjoyed by religious and secular groups alike." *Hosanna–Tabor*, 132 S.Ct. at 706. And an association under the First Amendment's expressive associational right is any group that engages in "expressive association." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000). But the First Amendment offers "special solicitude to the rights of religious organizations[,]" in addition to rights of association. We highlight these principles to show that churches or religious organizations are, at their core, expressive organizations, but organizations just the same. Consequently, churches may with certain legal and tax consequences engage in activities as secular organizations do. For a discussion of religious organizations' contractual operations, at least in the context of dealings with other religionists, see Michael A. Helfand & Barak D. Richman, *The Challenge of Co–Religionist Commerce*, 64 Duke L.J. (forthcoming 2014).

68. *Minker v. Balt. Annual Conference of United Methodist Church*, 894 F.2d 1354, 1360 (D.C.Cir.1990); *see Rayburn v. Gen. Conference of Seventh–Day Adventists*, 772 F.2d 1164, 1171 (4th Cir.1985) ("Like any other ... organization, [churches] may be held liable ... upon their valid contracts."); *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 714, 20 L.Ed. 666 (1871) (holding courts are always permitted to resolve contractual disputes involving "the manner in which churches own property, hire employees, or purchase goods.").

tors just as it can with outside parties."[69] "Enforcement of a promise, willingly made and supported by consideration, in no way constitutes a state-imposed limit upon a church's free exercise rights."[70]

We are not presented with a situation where the government is inappropriately meddling in the selection of who will minister to the congregation. Limits on a religious institution's ability to choose—or the criteria for choosing—who will minister to its faithful are not being foisted on the religious institution. The government had no role in setting the limits on how the Seminary's tenured professors may be terminated. Instead, this is a situation in which a religious institution has voluntarily circumscribed its own conduct, arguably in the form of a contractual agreement, and now that agreement, if found to exist, may be enforced according to its own terms. That cannot breach church autonomy.[71] Arguably, instead, this exemplifies religious autonomy because religious institutions are free to set forth policies that align with their respective mission.

Essentially, the Seminary willingly made a decision to offer tenure—a wholly secular concept[72]—in exchange for professorial services. Providing substance to the offer of tenure, the Seminary explicitly stated in writing that it would only terminate a tenured professor on three grounds: (1) "moral delinquency," (2) "unambiguous failure to perform the responsibilities outlined in [the Faculty] Handbook," and (3) "conduct detrimental to the Seminary." Of course, under the First Amendment, and the ministerial exception for that matter, the Seminary enjoys the right to excuse ministers as it sees fit. But here, the Seminary circumscribed its right to excuse faculty, ministers or not. The Seminary agreed to only express its First Amendment right under limited conditions.

Constitutional rights are often examined from a contractual viewpoint. For example, criminal defendants, when signing a plea agreement, enter into a contract, effectively waiving their right to a jury trial or right to appeal.[73] Additionally, parolees, upon their release, enter into a contract allowing their residence to be searched at any time, even absent reason-

---

**69.** *Jenkins v. Trinity Evangelical Lutheran Church*, 356 Ill.App.3d 504, 292 Ill.Dec. 195, 825 N.E.2d 1206, 1212 (2005).

**70.** *Patruska*, 462 F.3d at 310. Just as a decision to fire a minister is "the church's alone," *so, too, is the decision to set grounds for the firing. Hosanna–Tabor*, 132 S.Ct. at 709.

**71.** If enforcing a church's voluntary transactions and obligations were a breach of church autonomy, then all tenure contracts with seminary professors, assuming they are ministerial employees, as well as other employment contracts, would arguably be illusory. Additionally, the Seminary may face problems with accreditation, not to mention remaining competitive in the marketplace and luring new professors.

**72.** The American Association of University Professors, an amicus in this case, defines *tenure* as "an arrangement whereby faculty members, after successful completion of a period of probationary service, can be dismissed only for adequate cause or other possible circumstances and only after a hearing before a faculty committee." http://www.aaup.org/issues/tenure (last accessed April 6, 2014, at 11:25 a.m.). Incidentally, it could be argued that the offering of tenure indicates Kirby, or any tenured professor at the Seminary, is not a minister. Tenure is intended as a protection for *academic* freedom and is not traditionally thought of as the proper employment classification to describe the relationship between a clergyperson and the institution the clergyperson serves.

**73.** *See, e.g., Putty v. Commonwealth*, 30 S.W.3d 156, 159–60 (Ky.2000); *Commonwealth v. Reyes*, 764 S.W.2d 62 (Ky.1989).

able suspicion.[74] It nearly goes without saying that the First Amendment is of no less importance than the rights waived by criminal defendants in the preceding examples. Despite its importance, however, "speech rights are alienable, at least in some contexts."[75] Courts have often approved of government placing restrictions on its own employees regarding speech rights under the First Amendment.[76]

The unique facts of this case, however, present a situation where the employer, rather than the employee, is ceding a degree of its constitutional rights. We are unable to express a reason why an employer would not be allowed to alter its rights in such a manner. The Seminary has agreed—allegedly through contract—to fire tenured professors, whether ministers or not, only under certain specified conditions. Accordingly, the Seminary's decision to fire a tenured professor, whether a minister or not, is completely free of any government involvement or restriction. In the absence of government interference, the ministerial exception cannot act as a bar to an otherwise legitimate suit.

The remaining concern is whether applying state contract law to Kirby's claims would involve excessive government entanglement and thereby violate the broader ecclesiastical abstention doctrine.

**b. Because Kirby's contract involves no matters of church doctrine, the ecclesiastical abstention doctrine does not act as a bar.**

 The parties dispute whether the application of the ecclesiastical abstention doctrine is an issue that is properly before us. The Seminary's argument is well-taken and, for that matter, accurate. Typically, this Court will only review issues raised in a motion for discretionary review.[77] And Kirby failed to raise the ecclesiastical abstention doctrine until his brief. But the applicability of the ministerial exception—the main issue in this case—is so inextricably intertwined with the ecclesiastical abstention doctrine that any attempt at resolution without dealing with ecclesiastical matters would be misguided and perhaps even incorrect. As the final arbiter of disputes in Kentucky, this Court must be free to review comprehensively any applicable legal precedent to support the proper development of the law in the Commonwealth. For that reason, we will proceed to review the issue of the application of the ecclesiastical abstention doctrine.

 The United States Supreme Court has long recognized the concept of church autonomy bound up in the First Amendment.[78] In *Watson v. Jones,* the Court

---

74. *See Samson v. California,* 547 U.S. 843, 850, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006) (noting that "parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment" and, as such, parolees have no "expectation of privacy that society would recognize as legitimate."); *see also* Comment, *The Parole System,* 120 U. PA. L.REV. 282, 288 (December 1971) ("Against the developments represented by *Miranda v. Arizona* and *Gideon v. Wainwright,* expanding and safeguarding the rights of the suspected criminal, the contract serves as a waiver of rights.") (internal citations omitted).

75. *See* Daniel A. Farber, *Another View of the Quagmire: Unconstitutional Conditions and Contract Theory,* 33 FLA. ST. U.L.REV. 912, 920 (Spring 2006).

76. *Id.* at 920–23.

77. *See Ellison v. R & B Contracting, Inc.,* 32 S.W.3d 66, 71 n. 8 (Ky.2000); *Wells v. Commonwealth,* 206 S.W.3d 332, 335 (Ky.2006).

78. As an aside, §§ 1 and 5 of the Kentucky Constitution essentially embody the Free Exercise and Establishment Clauses of the Federal Constitution. We have held, with regard to these Kentucky sections, that "our state

held that when the resolution of the case is "dependent on the question of doctrine, discipline, ecclesiastical law, rule, or custom, or church government"[79] and the church's highest tribunal has ruled, the Court is bound by the tribunal's ruling. The Court, in *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.,*[80] expressed church autonomy more bluntly, saying the *Watson* decision "radiate[d] ... a spirit of freedom for religious organizations, an independence from secular control or manipulation—in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine."[81] Courts must avoid "unconstitutionally undertak[ing] the resolution of quintessentially religious controversies whose resolution the First Amendment commits exclusively to the highest ecclesiastical tribunals"[82] of the respective church.

▌ The courts of Kentucky have an equally strong tradition of avoiding interference or excessive entanglement with ecclesiastical disputes. It would be difficult for the ecclesiastical abstention doctrine to be more clearly expressed than "[i]n such matters relating to the faith and practice of the church and its members, the decision of the church court is not only supreme, but is wholly without the sphere of legal or secular judicial inquiry."[83] Separation of church and state, being a vibrant principle historically in this Commonwealth, requires that "the secular courts have no jurisdiction over ecclesiastical controversies and ... will not interfere with religious judicature or with any decision of a church tribunal relating to its internal affairs, as in matters of discipline or excision, or of purely ecclesiastical cognizance."[84] Secular courts may, however, have jurisdiction over a case involving a church if "neutral principles of law" can be applied in reaching the resolution.[85]

In past cases, Kentucky courts, often citing *Music,*[86] have been entirely unwilling at the first sign of religious language to review a plaintiff's claim against a church. But the ecclesiastical abstention doctrine does not require the complete absence of religious language before a secular court may have jurisdiction. And perhaps more importantly, nor does the holding in *Music. Music* involved an employment dispute based around The United Methodist Church's *The Book of Discipline,* the denomination's official book of church law and doctrine; and the Court heavily cited the ecclesiastical nature of Music's dispute with the church. Simply put, *Music* stands for the proposition that secular courts must cede jurisdiction when the resolution of the case centers

constitution offers no more protection than the same or similar section of the federal constitution." *Gingerich v. Commonwealth,* 382 S.W.3d 835, 839 (Ky.2012). Consequently, our jurisprudence is linked to the Supreme Court's interpretation of the First Amendment.

**79.** *Watson,* 80 U.S. (13 Wall.) at 680.

**80.** 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952).

**81.** *Id.* at 116; *see also Presbyterian Church v. Hull Church,* 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969).

**82.** *Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich,* 426 U.S. 696, 720, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976).

**83.** *Marsh v. Johnson,* 259 Ky. 305, 82 S.W.2d 345, 346 (1935).

**84.** *Id.*

**85.** *See Jones v. Wolf,* 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979).

**86.** 864 S.W.2d 286.

on, depends on, revolves around, or turns on actual church doctrine or the interpretation of faith tenets. To read *Music* as a broad declaration on all disputes involving churches is to miss the point.

 At bottom, the ecclesiastical abstention doctrine is primarily interested in preventing any chilling effect on church practices as a result of government intrusion in the form of secular courts.[87] But when the case merely involves a church, or even a minister, but does not require the interpretation of actual church doctrine, courts need not invoke the ecclesiastical abstention doctrine. No entanglement concern arises as a result of the mere reference of religion.[88] Courts must "look not at the label placed on the action but at the actual issues the court has been asked to decide." [89] Here, Kirby's breach-of-contract claims require no inspection or evaluation of church doctrine. Neutral principles of law can be applied.[90] Accordingly,

the ecclesiastical abstention doctrine does not apply in this case.

We are not alone in the view we express today. In *Minker*, the District of Columbia Circuit concluded that a former pastor's claim regarding the breach of an oral contract could proceed against his former church. In doing so, the court acknowledged excessive entanglement may be a real possibility during the litigation but countered that the trial judge has adequate discretion to control discovery and the flow of evidence so that if ecclesiastical matters overtake the litigation, the case can be stopped on summary judgment or simply dismissed.[91] We agree with the court in *Minker*.

Furthermore, this is not a novel position for courts of Kentucky. For instance, in *Lexington Theological Seminary v. Vance*, the Court of Appeals held the interpretation of the Student Handbook at the Seminary was a contractual matter, adequately devoid of ecclesiastical matters. The

87. We note that it is of no consequence whether it is the legislature or the judiciary intruding on churches. Both are state actions covered by the First Amendment. *See NAACP v. Alabama*, 357 U.S. 449, 463, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (It is established doctrine that "[i]t is not of moment that the State has here acted solely through its judicial branch, for whether legislative or judicial, it is still the application of state power which we are asked to scrutinize."); *Shelley v. Kraemer*, 334 U.S. 1, 14, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) ("That the action of state courts and of judicial officers in their official capacities is to be regarded as action of the State within the meaning of the Fourteenth Amendment, is a proposition which has long been established by decisions of this Court.").

88. *See Hartwig v. Albertus Magnus Coll.*, 93 F.Supp.2d 200 (D.Conn.2000).

89. *Second Episcopal Dist. African Methodist Episcopal Church v. Prioleau*, 49 A.3d 812, 816 (D.C.2012) (quoting *Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 356 (D.C. 2005)).

90. *See, e.g., Crymes v. Grace Hope Presbyterian Church, Inc.*, No. 2011–CA000746–MR, 2012 WL 3236290 (Ky.App. Aug. 10, 2012); *Lexington Theological Seminary v. Vance*, 596 S.W.2d 11 (Ky.App.1979). The Seminary's argument that faculty were required to live as models of ministry or Christianity and, therefore, the nature of the contract action is ecclesiastical, is misguided. "That faculty members are expected to serve as exemplars of practicing Christians does not serve to make the terms and conditions of their employment matters of church administration and thus purely of ecclesiastical concern." *E.E.O.C. v. Mississippi Coll.*, 626 F.2d 477, 485 (5th Cir. 1980).

91. *Minker*, 894 F.2d at 1360 ("It could turn out that in attempting to prove his case, appellant will be forced to inquire into matters of ecclesiastical policy even as to his contract claim. Of course, in that situation, a court may grant summary judgment on the ground that appellant has not proved his case and pursuing the matter further would create an excessive entanglement with religion.").

*Vance* court was so sure there was no entanglement that it declined even to discuss the First Amendment concerns. And, notably, the terms to be interpreted in *Vance* were far more ambiguous and possibly ecclesiastical than those presented here. The court dealt with such words and phrases as "Christian ministry," "gospel transmitted through the Bible," "servants of the gospel," "firmly committed to the role and mission with which they will begin their ministry," "fundamental character," and "display traits of character and personality which indicate probable effectiveness in the Christian ministry." [92] The language regarding Kirby's tenure rights is unambiguous and does not necessitate any reach into church doctrine or polity.[93]

Under the ecclesiastical abstention doctrine, the question at the heart of whether Kirby's contract claim should be allowed is "whether [Kirby's] breach of contract claim can be decided without wading into doctrinal waters." [94] When we consider the elements of breach of contract, as well as the particular contract at issue, we find no reason why a secular court is not able adequately to enforce the documents governing Kirby's former relationship with the Seminary.

Finally, we emphasize that Kirby is seeking compensatory damages, not specific performance or reinstatement. We think there is little doubt that reinstatement is an unavailable remedy in all actions because that *would* entail a secular court deciding who speaks for the church. That we cannot do. In *Hosanna–Tabor*, Chief Justice Roberts noted for the majority that compensatory damages, punitive damages, or attorney's fees "would operate as a penalty on the Church for terminating an unwanted minister, and would be no less prohibited by the First Amendment than an order overturning the termination." [95] Critically, *Hosanna–Tabor's* holding was solely in the context of available remedies under employment discrimination legislation. We find the "penalty" proposition inapplicable to the case at hand. Here, the so-called penalty was negotiated and agreed to by the religious institution in deciding to hire someone to minister to the faithful. Again, the enforcement of a religious institution's bargained-for promise in no way constitutes a penalty sufficient to violate the religious institution's First Amendment rights.

We are reluctant to provide a list of claims that may succumb to the ministerial exception. And, specifically, we hesitate to proclaim categorically contract actions outside the reach of the ministerial exception. Allowing Kirby's breach of · contract claim—a claim involving a written contract with specific, unambiguous conditions—to proceed is sufficient for today. Generally speaking, however, contract claims—to the extent that they are barred for religious reasons—will be barred due to the ecclesiastical abstention doctrine.[96] Contracts

---

92. *Id.* at 13.

93. Notably, "spiritual restructuring," as the Seminary argues on appeal, is not an acceptable ground for termination under its contract with Kirby. As a result, it would seem that arguing Kirby was fired as a result of a "spiritual restructuring" is irrelevant, or at the very least, fruitless.

94. *Patruska*, 462 F.3d at 312.

95. *Hosanna–Tabor*, 132 S.Ct. at 709.

96. Of course, contracts may exist that require a review of the religious qualifications and performance of a minister in determining whether the elements of a claim are satisfied. And at-will or oral employment contracts may present additional issues. Perhaps the ministerial exception would apply, but we are not presented with these concerns here. In the present case, we only face a written contract with clear language. Future appeals will provide ample opportunity to resolve any finer points of application.

between two parties, even if the parties are a religious institution and a former employee, do not involve government interference because the parties negotiated the particular conduct limitations. If the contracts involve church doctrine, a court is more accurate in ending the litigation on the basis of ecclesiastical abstention rather than the ministerial exception.

In the future, when faced with making a determination of whether the ministerial exception should apply, trial courts should focus on the purpose of the ministerial exception: to allow a religious institution, free of government intervention, to exercise its right to choose who will play an integral role in the presentation of its tenets. If the elements of the presented claim do not result in governmental violation of this purpose, the claim should proceed. The ministerial exception is a particularized exception for the employment arena; but, importantly, it "does not apply to *all* employment decisions by religious institutions nor does it apply to *all* claims by ministers." [97]

Accordingly, summary judgment is inappropriate in this case because viewing the facts in a light most favorable to Kirby, there remain questions of material fact regarding the contractual relationship between Kirby and the Seminary and whether that relationship was breached. The Seminary argues there was no contract because the President's signature was missing and, further, that there is an implied right to fire tenured professors during a financial exigency. These are issues to be explored in further proceedings on remand.

### III. CONCLUSION.

We reverse the Court of Appeals and remand this case for further proceedings consistent with this Opinion. A question

of material fact remains regarding the elements required for a breach of contract claim. The fundamental *existence* of a contract is in dispute, according to the Seminary. Kirby's status as a ministerial employee does not, however, bar the claims in contract from proceeding. But the ministerial exception *does* bar Kirby's claim of discrimination based on race under KRS 344.040. The approach we adopt today, in dealing with the ministerial exception, strikes a proper and workable balance between religious liberty and individual rights and employment contracts.

All sitting. All concur.

**B.D., Appellant**

v.

---

97. *Weishuhn,* 756 N.W.2d at 498.