Laurence H. KANT, Appellant

v.

**LEXINGTON THEOLOGICAL SEMINARY, Appellee.**

No. 2012–SC–000502–DG.

Supreme Court of Kentucky.

April 17, 2014.

Christopher D. Miller, Arnold & Miller, PLC, for Appellant.

Elizabeth S. Muyskens, Richard Garrett Griffith, Stoll, Keenon & Ogden, PLLC, for Appellee.

Aaron Nisenson, American Association of University Professors, C. David Emerson, Emerson Law Office, Patrick J. Slevin, Stephen A. Vaden, Patton Boggs, LLP, for Amicus Curiae American Association of University Professors.

Barry Levenstam, Debbie L. Berman, Micah J. Cogen, Jenner & Block, LLP, Eric L. Ison, Bingham, Greenebaum, Doll, LLP, for Amicus Curiae The Anti–Defamation League.

Erik W. Stanley, Alliance Defending Freedom, Bryan Howard Beauman, Joshua Michael Salsburey, Sturgill, Turner, Barker & Moloney, PLLC, for Amicus Curiae Alliance Defending Freedom and Association of Christian Schools International.

Dr. Leslie C. Griffin, University of Nevada, Las Vegas, Boyd School of Law, for Amicus Curiae University of Nevada, Las Vegas, Boyd School of Law.

Opinion of the Court by Chief Justice Minton.

In *Kirby v. Lexington Theological Seminary*,[1] a case rendered today in tandem with this case, we explicitly adopted the ministerial exception for employment disputes between religious institutional employers and their ministerial employees. This case presents the question whether the ministerial exception categorically applies to all professors employed by seminaries.

Laurence Kant was a tenured Professor of Religious Studies at Lexington Theological Seminary, employed to teach courses on several religious and historical subjects. The Seminary terminated his employment, and Kant challenged the legitimacy of his termination by filing this action for breach of contract and breach of implied cove-

---

1. No. 2012–SC–000519–DG, 426 S.W.3d 597, 2014 WL 1512223 (Ky. April 17, 2014).

nants of good faith and fair dealing. The trial court granted summary judgment dismissing Kant's claims; and a divided panel of the Court of Appeals affirmed the trial court's dismissal, holding that Kant was a ministerial employee of the Seminary.

On discretionary review, we reverse the decision of the Court of Appeals because we hold that Kant was not a ministerial employee of the Seminary. We reject a categorical application of the ministerial exception that would treat all seminary professors as ministers under the law. Each case must be reviewed on the totality of its facts as we outlined in *Kirby*. Kant, as opposed to Kirby, did not participate in significant religious functions, proselytize, or espouse the tenets of the faith on behalf of his religious institutional employer. The trial court, consequently, erred by granting summary judgment because questions of material fact exist regarding the contractual claims asserted by Kant, so we remand the case to the trial court for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

### A. The Seminary.

We reproduce here the same factual background information regarding the Seminary as found in *Kirby*. The facts in this case and *Kirby* differ only in the roles played by Kirby and Kant.

Founded in 1865, originally as the College of the Bible on the campus of Transylvania University,[2] Lexington Theological Seminary is "an accredited graduate theological institution of the Christian Church (Disciples of Christ)." The stated mission of the Seminary is "to prepare faithful leaders for the church of Jesus Christ and, thus, to strengthen the church's participation in God's mission for the world." In executing its mission, the aim of the Seminary is "to prepare women and men of varied backgrounds and traditions for ordained and other forms of ministry." Consistent with this mission and the tenets of the Christian Church (Disciples of Christ), the Seminary is intentionally ecumenical, with nearly half of its enrollment coming from other Christian denominations.

Perhaps as a good business practice or perhaps because accreditation standards require it,[3] the Seminary opted to put the policies, procedures, expectations, and other conditions of employment in writing for its faculty, staff, and other employees. Despite the Seminary's argument to the contrary, with regard to faculty, the Faculty Handbook explicitly supersedes the Employee Handbook. The Faculty Handbook stated the fundamental responsibility of faculty [4] "shall be to uphold the purpose

---

2. Transylvania University, a private liberal arts university, established an affiliation with the Christian Church (Disciples of Christ)—a church movement largely born in Kentucky—in 1865, following the turmoil of the Civil War. The affiliation continues today. Eventually, in 1950, the Seminary relocated away from Transylvania's campus and, in 1965, adopted its current name.

3. The Association of Theological Schools in the United States and Canada, of which the Seminary is an accredited member, lists the following in its *Standards for Accreditation:* "Each school shall articulate and demonstrate that it follows its policies concerning

faculty members in such areas as faculty rights and responsibilities; freedom of inquiry; procedures for recruitment, appointment, retention, promotion, and dismissal; criteria for faculty evaluation; faculty compensation; research leaves; and other conditions of employment. *Policies concerning these matters shall be published in an up-to-date faculty handbook.*" ASS'N OF THEOLOGICAL SCHOOLS IN THE UNITED STATES AND CANADA, *Standards for Accreditation* 5.1.5 BULLETIN 50, PART 1 (2012) (emphasis added).

4. The "faculty" of the Seminary was organized in the following hierarchy: Professors, Associate Professors, Assistant Professors,

of Lexington Theological Seminary to prepare faithful leaders for the Church of Jesus Christ and, thus, to strengthen the Church's participation in God's mission for the world." And although there was no ordination requirement, faculty were expected "to serve as models for ministry" and, in doing so, "relate to students, staff, and faculty colleagues with integrity and respect." Faculty were mandated to attend all faculty meetings and participate in formal Seminary events, including orientation. Attendance for informal Seminary events was left to the discretion of the particular faculty member. Finally, faculty were "expected" but not required to participate in Seminary worship services and convocations.

Of principal importance for the instant case, the Faculty Handbook also detailed the procedure for termination of tenured faculty. Proceedings to dismiss a tenured professor could only be instituted by the president, the dean, or a member of the faculty. "The only grounds for dismissal of a tenured faculty member are moral delinquency, unambiguous failure to perform the responsibilities outlined in this Handbook, or conduct detrimental to the Seminary." Employed on an annual probationary basis, non-tenured faculty may only be dismissed for cause, as well.

Amidst a nationwide economic downturn, the Seminary began experiencing severe financial problems in 2009. During the period from July 2007 to January 2009, the Seminary saw its endowment shrink from roughly $25 million to $16 million.[5]

At the time, the Seminary had ten full-time professors, twenty-one other full-time staff members, and a number of part-time instructors.[6] In order to survive the "tsunami of economic disasters,"[7] the Seminary decided to terminate a number of faculty and staff positions. The Board of Trustees approved eliminating tenured faculty. And Kant was among them. Before terminating Kant's employment, the Seminary offered him a severance package consisting of an additional year's employment with a year's salary in exchange for Kant's release of all potential claims against the Seminary. Kant declined the severance package. Finally, the Seminary restructured its curriculum and mission in an attempt to weather the financial chaos, opting to "emphasize practical training for clergy in areas such as financial management, conflict resolution and the use of technology ... rather than ... theology and biblical studies."[8]

## B. Kant's Claims Against the Seminary and the Decisions Below.

After Kant's termination, he filed this action against the Seminary for breach of contract and breach of the implied duty of good faith and fair dealing. And Kant also sought a declaratory judgment that his termination constituted a breach of contract. The Seminary moved to dismiss the complaint or alternatively to grant summary judgment in its favor. Ostensibly on First Amendment grounds—because that was the primary argument presented—the

Instructors, and Ministers–in–Residence. Additionally, there were three types of complementary teachers: Adjunct Professors, Visiting Professors, and Lecturers. Professors, Associate Professors, and Assistant Professors were considered positions capable of attaining tenure.

5. Peter Smith, *Lexington seminary faces fiscal crisis*, LOUISVILLE COURIER-JOURNAL, January 14,

2009, *available at* http://www.lextheo.edu/wp-content/uploads/2009/01/ltsfacescrisis.pdf.

6. *Id.*

7. *Id.*

8. *Id.*

trial court granted the Seminary's motion for summary judgment. The trial court apparently believed ecclesiastical entanglement put this employment dispute beyond the reach of the courts.

On appeal, the Court of Appeals also found the ecclesiastical abstention doctrine to apply. According to the Court of Appeals, interpreting the Faculty Handbook and becoming involved in Kant's dispute thrust the court unconstitutionally into a matter of church governance. The Court of Appeals went on to find Kant's claims barred as a result of the ministerial exception. In so finding, the Court of Appeals essentially recognized a categorical rule making all seminary professors ministers for purposes of the ministerial exception. The Court of Appeals did not engage in an intensive review of the totality of the circumstances but focused on the importance of Kant's position to the mission of the Seminary and the fact that no courses were taught for a secular reason at the Seminary.

The fact that Kant is Jewish was of no significance to the Court of Appeals. The majority opinion noted, "Kant's personal beliefs do not clash with the actuality that the classes he taught at [the Seminary] were for the purpose of preparing future church leaders of the Christian faith."

This view of Kant's personal beliefs served as the primary basis for the dissent. The dissent found the majority's holding far too broad, ignoring the distinction between "teaching religion and teaching *about* religion." Furthermore, the dissent put plainly its reasoning why it was impossible to "discount" Kant's personal beliefs: "A basic tenet of Christianity is that Jesus Christ is the Son of God. Judaism does not accept that tenet. Therefore,

it appears that[ ] because of this seminal difference, Kant, as a practicing Jew, would not be qualified to be a minister of any Christian faith."

## II.  ANALYSIS.

### A.  Kant is not a Minister Under the Ministerial Exception.

■ In *Kirby*, we outlined the appropriate method of determining whether the employee of a religious institution is a minister under the ministerial exception. We did not adopt an inelastic approach. The legal determination of a minister, instead, requires a review of the totality of the circumstances surrounding the plaintiff's employment.

■ The United States Supreme Court, in *Hosanna–Tabor Evangelical Lutheran Church and School v. E.E.O.C.,*[9] formally recognized the constitutional foundation of the ministerial exception. The Court, however, did not provided any substantial guidance on how a court should determine if an employee is a minister for ministerial exception purposes. In finding the employee to be a minister in *Hosanna–Tabor*, the Court seemed to focus somewhat on the employee's title and employed four generic factors. In *Kirby*, faced with adopting the ministerial exception into our jurisprudence, we thought "more discussion of the actual acts or functions conducted by the employee would be prudent."[10] Expanding on the four factors provided in *Hosanna–Tabor*, we determined that a trial court should undergo the following review:

When considering the formal title given, a trial court should weigh whether the title is inherently, exclusively, or primarily religious. The consideration of the

9. —— U.S. ——, 132 S.Ct. 694, 181 L.Ed.2d 650 (2012).

10. *Kirby*, No.2012–SC–000519–DG, 426 S.W.3d at 613 (Ky. April 17, 2014).

substance reflected in the title should include the duties and responsibilities associated with the title. The trial court, in looking to the associated duties and responsibilities, may look at whether they carried substantial religious significance, involved supervision or participation in religious ritual and worship, or spreading the tenets or doctrine of the faith. The employee's own use of the title should include consideration of whether the position involved, expected, or required proselytizing on behalf of the religious institution. Or, did the employee use the title in a manner that would indicate to the members of the particular faith community or to the public that he was a representative of the religious institution authorized to speak on church doctrine. Finally, consideration of the important functions performed for the religious institution should involve a review of whether those functions were essentially liturgical, closely related to the doctrine of the religious institution, resulted in a personification of the religious institution's beliefs, or were performed in the presence of the faith community.[11]

In the circumstances of the instant case, we find it important to emphasize the connection between the religious institution's employee and the doctrine or tenets of the religious institution. A minister, in the commonly understood sense, has a very close relationship with doctrine of the religious institution the minister represents. The members of the congregation or faith community view a minister as one who is, among other things, the face of the religious institution, permitted to speak for the religious institution, the embodiment of the religious institution's tenets, and leader of the religious institution's ritual. Kant did none of these things.

Kant was hired as a full-time faculty member in 2002. Described as a "utility player" by the Seminary's former dean, Kant taught fourteen different courses between 2002 and 2006. Kant's classes covered a wide range of topics, including: Jewish Studies, theology, ethics, Hebrew Bible, New Testament, world religions, American religion, Greek, and Hebrew. And Kant taught a number of classes related to cultural studies, such as "Values and Religion in American Culture," "Jesus in Film and Literature," "War and Peace in Biblical Tradition," and "Jewish–Christian Dialogue."

Kant's self-described goal as a professor included having, in all his courses, a "spiritual foundation rooted in the awareness of interconnectedness, interdependence, mindfulness, empathy, compassion, pastoral concern, love, study as a form of meditation, and the importance of acts of loving kindness." And Kant described his teaching "as assisting students in learning to interpret historical and modern cultures and contexts responsibly, thoughtfully, and imaginatively."

In 2006, the Seminary granted Kant tenure. Becoming a tenured professor provided Kant the opportunity for a new title at the Seminary. After discussions with the Dean, it was settled that Kant would be called the Associate Professor of the History of Religion. This development pleased not only Kant, but his faculty colleagues as well, prompting them to comment: "I am pleased with the definition of his discipline as 'History of Religion,' it better expresses what Dr. Kant teaches as well as his interests"; "The wide range of courses he has taught indicates that when he first started teaching his place within the faculty was not well defined, therefore I am glad that he has taken on the title of

---

11. *Id.* at 613–14 (internal quotations and citations omitted).

'History of Religion' which should help him to focus on a core set of courses"; "He greatly contributes to our curriculum and he is providing important learning opportunities for our students by offering courses on Jewish–Christian relations, World Religions, and other courses that focus on culture"; and "I felt he needed to tighten the focus in his teaching and this will happen as he takes on the public definition of his discipline as 'History of Religion.'"

During his employment at the Seminary, Kant participated in Seminary life outside of simply instructing. In 2002, Kant participated as a scripture reader at the ordination of the Reverend Mike Bryant and, in 2003, Kant gave the ordination sermon for the Reverend Robin Colerick. Kant also gave the invocation at a faculty meeting on October 7, 2002, as well as December 4, 2003. Again, in 2008, Kant served as the scripture reader at an ordination ceremony.

Throughout his time at the Seminary, Kant participated in chapel services, Tuesday lunches, student orientation, faculty meetings, convocations, and other events. Kant denies ever taking communion at a Seminary service but did serve as a greeter for a communion service once in 2004. Kant also gave the benediction for the Student Orientation Chapel Service once in 2004.

Kant acknowledges his participation in Seminary events, including convocations and chapel services. But he claims he never did so as a Christian, rather, as a teacher and Jew. Never did he espouse the tenets of the Christian Church (Disciples of Christ), or Christianity for that matter, because—by his own characterization—he was neither licensed nor qualified to do so. Regarding convocations, Kant did serve as the Chair of the Convocation Committee from 2002–2004, where he was tasked with arranging the presenters and speakers for the Seminary's convocation program.[12]

In light of Kant's participation in the Seminary and its mission, we must now turn to the *Kirby* factors and determine if Kant qualifies as a minister. First, Kant's formal titles given by the Seminary were not inherently, exclusively, or primarily religious. Of course, serving as a professor of either "Religious Studies" or "History of Religion" inherently involves religion because it does instruct on the subject of religion in some way. But there is no indication that the title has any significance to the *particular* religious views of the Seminary. In fact, "Religious Studies" and "History of Religion" are common in the academic world to indicate the secular study of religion.[13] Kant's titles do not indicate any way in which Kant is expected to espouse the tenets of the Christian Church (Disciples of Christ) or the Seminary, to the extent they may differ.[14]

**12.** In this role, Kant brought in various public speakers to provide students with cultural context, including community leaders, policy analysts, business leaders, ministers and other spiritual leaders, musicians, and journalists. The record is unclear whether the convocations had any particular religious orientation, but the class of speakers listed by Kant at least gives the impression of a secular nature.

**13.** For example, Yale University describes its Department of Religious Studies as a program "provid[ing] opportunities for the scholarly study of a number of religious traditions

and disciplines. At the undergraduate level, the Department offers a wide array of courses that cover the major religions of the world, with a strong emphasis on their history and their intellectual traditions." http://religiousstudies.yale.edu/ (last accessed April 7, 2014 at 11:45am).

**14.** As we highlighted in *Kirby*, at oral argument, the Seminary attempted to separate from the Christian Church (Disciples of Christ) for the purposes of the tenets the Seminary purports to represent. As the recitation of facts here, and especially in *Kirby*,

Second, the substance reflected in Kant's title similarly indicates an absence of any connection to the faith of the Seminary. As we mentioned above, Kant's titles suggest an academic treatment of the study of religion. In *Kirby*, we held a court should consider "the duties and responsibilities associated with the title" when considering the title's substance.[15] And, when looking at the duties and responsibilities, we should review whether "they carried substantial religious significance, involved supervision or participation in religious ritual and worship, or spreading the tenets or doctrine of the faith."[16] Admittedly, the duties and responsibilities associated with Kant's title include the promotion of the Seminary's mission and participation in Seminary events. We are unconvinced, however, that these duties alone are enough to label Kant a ministerial employee.

The Court of Appeals took a contrary view, which the Seminary urges us to affirm, holding essentially anyone who promotes the mission of the religious institution is a minister under the law. But we cannot agree with this. The simple pro-

motion of a religious institution's mission, alone, provides little insight into whether the duties or responsibilities undertaken by the employee "carried substantial religious significance."[17] And, certainly, mission promotion in no way indicates whether the employee's duties or responsibilities involved "supervision or participation in religious ritual and worship[ ] or spread[ing] the tenets or doctrine of the faith."[18] The conduct said to be in promotion of the religious institution's mission must be linked to the tenets of the religious institution's faith.[19]

Kant's "own use of his title" further displays that he is not a minister. As a professor, Kant's role did not "involve[ ], expect[ ], or require[ ] proselytizing on behalf of the religious institution."[20] Nor did Kant use his role in any way that would indicate to the members of the faith he was a "representative of the religious institution authorized to speak on church doctrine."[21] Rather, Kant's professorial role exemplifies the distinction between "teaching about religion" and "the teaching

---

indicates, the Seminary is closely affiliated with the Christian Church (Disciples of Christ) and, presumably, would espouse those tenets. We do not make that determination today and take no position on the appropriateness of making that decision because regardless of whether the Seminary's tenets for purposes of the ministerial exception are simply those shared by Christian faith communities generally or mirror doctrines that might be unique to the Christian Church (Disciples of Christ) denomination, Kant is not a ministerial employee. Furthermore, it is of no import that the Seminary's tenets are of a broad, ecumenical nature. The First Amendment protection afforded remains the same.

15. No. 2012–SC–000519–DG, 426 S.W.3d at 613–14 (Ky. April 17, 2014).

16. *Id.*

17. *Id.*

18. *Id.*

19. *See* Mark E. Chopko 85 Marissa Parker, *Still a Threshold Question: Refining the Ministerial Exception* Post–Hosanna–Tabor, 10 First Amend.L.Rev. 233, 285–86 (Winter 2012) ("[T]he business of religion reflects certain key ideas: preaching, teaching, proselytizing, inculcating, caring, curing, and other actions expressing religious beliefs in the community and the world. The issue therefore might be more easily joined as asking religious institutional litigants, as a threshold consideration, how the challenged employment positions are linked to the core religious expressions for which the organization exists.").

20. *Kirby*, No.2012–SC–000519–DG, 426 S.W.3d at 613–14 (Ky. April 17, 2014).

21. *Id.*

of religion."[22] The record does not evince any example of Kant holding himself out as an employee authorized to speak on church doctrine.

Finally, Kant did not, in the context of the Seminary's strong connection with the doctrine of the Christian Church (Disciples of Christ), perform any "important functions" for the Seminary. In making this determination, we consider whether the functions performed by Kant "were essentially liturgical, closely related to the doctrine of the religious institution, resulted in a personification of the religious institution's beliefs, or were performed in the presence of the faith community."[23] Of course, in the general sense, Kant did perform a religious function. Kant dealt closely with religious texts, biblical languages, and scriptural interpretations. But, again, Kant had no relationship with the tenets of the Seminary's faith. Instead, Kant provided supplemental education to give breadth and depth to the education provided by the Seminary. Kant was a "source of religious instruction" but did not play "an important role in transmitting the [Seminary's] faith to the next generation."[24]

█ Additionally, the functions performed by Kant were not liturgical, did not personify the Seminary's beliefs, and were not performed in the presence of the faith community. As Kant admits, as a practicing Jew, he is not licensed as Christian clergy or qualified to partake in or lead any Christian rites of worship. While an employee practicing a different religion than the religious institutional employer is not dispositive, it is indicative of the employee's relationship to the tenets of the faith espoused by the Seminary.

Of course, given the diversity of religious views, it is possible to imagine an employee and employer having divergent religious views and, yet, the employee performing important religious functions on behalf of the employer.[25] Going further, one may imagine a ministerial employee who shares the employer's faith but does not strictly follow all the tenets of the faith.[26] We are quick to stress that the simple fact that an employee professes a different religious belief system than his religious institutional employer does not eliminate the employee as a ministerial employee under the law. The primary focus under the law is on the nature of the particular employee's work for the religious institution. Here, Kant's work was chiefly secular. And the nature of Kant's work, rather than his personal belief system, serves as the basis for the determination that Kant is not a minister. Nonetheless, an employee's personal belief system may be considered.

Based on the foregoing analysis, it is now clear that seminaries, much like any

22. *School Dist. of Abington Tp., Pa. v. Schempp*, 374 U.S. 203, 306, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (Goldberg, J., concurring).

23. *Kirby*, No.2012–SC–000519–DG, 426 S.W.3d at 613–14 (Ky. April 17, 2014).

24. *Hosanna–Tabor*, 132 S.Ct. at 708.

25. *Kirby* is an example of this very proposition. The Seminary is closely affiliated with the Christian Church (Disciples of Christ), but Kirby was a member of the Christian Methodist Episcopal denomination. Although these faith communities do have an official ecumenical relationship, as we acknowledge in *Kirby*, they are separate, distinct religious denominations.

26. For example, a particular religious institutional employer may teach, for example, that adherents abstain from alcohol or tobacco or any form of birth control as an important expression to the faith espoused by the institution; but the employee personally rejects those teachings. The employee may still be found to be a ministerial employee.

religious institution, may have nonministerial employees. Seminaries, or other religious institutions, remain free to select "who will personify [their] beliefs." [27] This opinion in no way reduces that right. When an employee operates in a nonministerial capacity, however, the employee should be entitled to full legal redress. As a result, the ministerial exception does not bar Kant's contractual claims.

## B. Ecclesiastical Abstention Does Not Bar Kant's Claims.

■ We noted in *Kirby*, however, that even though the ministerial exception may not act as a bar, we cannot ignore that the broader ecclesiastical abstention doctrine may do so. Generally speaking, if a contract involves a determination or interpretation of church doctrine, a former employee's suit will be barred because of ecclesiastical abstention, not the ministerial exception. Of course, as we acknowledged in *Kirby*,[28] this is not to say contractual claims are categorically immune from the ministerial exception. We simply acknowledge the inherency of ecclesiastical issues and accordingly the role played by the ecclesiastical abstention doctrine in claims involving religious institutions.

■ This issue received thorough treatment in *Kirby* so we will not expend a great amount of time on it here. Simply put, the ecclesiastical abstention doctrine does not work to deny jurisdiction in the circumstances presented. In *Kirby*, we held, "when the case merely involves a church, or even a minister, but does not require the interpretation of actual church doctrine, courts need not invoke the ecclesiastical abstention doctrine." [29] Indeed, if "neutral principles of law" or "objective, well-established concepts ... familiar to lawyers and judges" may be applied, the case—on its face—presents no constitutional infirmity.[30] Of course, neutral principles of law can be applied to the breach of contract claim presented in the instant case; but, more importantly, Kant's claim involves no consideration of or entanglement in church doctrine. We reiterate that the intent of ecclesiastical abstention is not to render "civil and property rights ... unenforceable in the civil court simply because the parties involved might be the church and members, officers, or the ministry of the church." [31]

Material questions of fact sufficient to defeat summary judgment remain regarding the contractual relationship of Kant and the Seminary.

## III. CONCLUSION.

For the reasons stated, we reverse the Court of Appeals and remand this case to the trial court for further proceedings consistent with this Opinion.

MINTON, C.J.; ABRAMSON, CUNNINGHAM, NOBLE, SCOTT, and VENTERS, JJ., sitting. All concur. KELLER, J., not sitting.

---

27. *Id.* at 706.

28. *Kirby*, No. 2012–SC–000519–DG, 426 S.W.3d at 620 n. 96 (Ky. April 17, 2014).

29. No. 2012–SC–000519–DG, 426 S.W.3d at 618–19 (Ky. April 17, 2014).

30. *Jones v. Wolf*, 443 U.S. 595, 603, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979).

31. *Jenkins v. Trinity Evangelical Lutheran Church*, 356 Ill.App.3d 504, 292 Ill.Dec. 195, 825 N.E.2d 1206, 1212 (2005).